No. 24-1133

In the
# United States Court of Appeals
## for the Seventh Circuit

───────────────────────

GWENDOLYN D. CUNNINGHAM,
Plaintiff-Appellant,

v.

LLOYD AUSTIN, III,
SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY,
Defendant-Appellee.

───────────────────────

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00165-SEB-TAB — Hon. Sarah Evans Barker, *Judge*.

───────────────────────

## BRIEF FOR THE APPELLEE

───────────────────────

ZACHARY A. MYERS
United States Attorney

Rachana N. Fischer
Assistant United States Attorney

Attorney for the Appellee
Lloyd Austin, III, Secretary of Defense

United States Attorney's Office
10 W. Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333

# TABLE OF CONTENTS

**Page No**.

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES....................................................... 2

STATEMENT OF THE CASE ......................................................... 3

SUMMARY OF THE ARGUMENT ................................................. 23

ARGUMENT ................................................................................. 24

I.      Legal Standard............................................................................. 24

        A.      Standard of Review.......................................................... 24

II.     Ms. Cunningham Cannot Meet Her Burden of Establishing Pretext...24

        A.      Ms. Cunningham Admitted that Mr. Hartz Promoted Mr.
                Griffin Because He Believed Mr. Griffin Was the Better
                Candidate.......................................................................... 26

        B.      The Applicants' Respective Qualifications Do Not Support a
                Finding of Pretext............................................................ 30

        C.      Mr. Griffin Exceeded the Minimum Qualifications for the Job...36

        D.      The Interview Questions Were Job Related............................ 39

        E.      Ms. Cunningham Admitted the Selection Was Delayed So Mr.
                Hartz Could Make the Selection.......................................... 40

        F.      Ms. Cunningham Has the Burden of Establishing Pretext........ 42

        G.      Ms. Cunningham's Claim that DFAS Could Have Non-
                Competitively Promoted Her into Upper Management Is
                Meritless...........................................................................44

        H.      The Statistical Report Does Not Show Pretext........................ 45

CONCLUSION.................................................................................................. 47

## TABLE OF AUTHORITIES

**Cases** **Page**

*Argyropoulos v. City of Alton*, 539 F.3d 724 (7th Cir. 2008)...........................27

*Baylie v. Fed. Rsrv. Bank of Chicago*, 476 F.3d 522 (7th Cir. 2007)...............45

*Bell v. E.P.A.*, 232 F.3d 546 (7th Cir. 2000) ....................................................45

*Blise v. Antaramian*, 409 F.3d 861 (7th Cir. 2005) ...........................27, 28, 29

*Clay v. United Parcel Serv., Inc.*, 501 F.3d 695 (6th Cir. 2007) .....................43

*Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559 (7th Cir. 2009).................26

*David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*,
   846 F.3d 216 (7th Cir. 2017)............................................................................25

*Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*,
   860 F.3d 494 (7th Cir. 2017)............................................................................24

*Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006)....................27

*Guinto v. Exelon Generation Co.*, LLC,
   341 F. App'x 240 (7th Cir. 2009) ..............................................................40, 41

*Hague v. Thompson Distribution Co.*, 436 F.3d 816 (7th Cir. 2006)..............43

*Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) ...........................................29

*Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013).........................41

*Hottenroth v. Vill. of Slinger*, 388 F.3d 1015 (7th Cir. 2004) .........................24

*Jajeh v. Cnty. of Cook*, 678 F.3d 560 (7th Cir. 2012) ......................................40

*Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018).......36

*Jordan v. City of Gary, Ind.*, 396 F.3d 825 (7th Cir. 2005) ............................26

*Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672 (7th Cir.1997).............43

*Kuhn v. Ball State Univ.*, 78 F.3d 330 (7th Cir. 1996) .................................... 35

*Little v. Illinois Dep't of Revenue*, 369 F.3d 1007 (7th Cir. 2004) ............. 27, 35

*Logan v. Kautex Textron N. Am.*, 259 F.3d 635 ............................................... 26

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............. 24, 25, 26, 42

*Mengistu v. Mississippi Valley State Univ.*,
    716 F. App'x 331 (5th Cir. 2018) .................................................... 32

*Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002) .................... 29, 30, 31, 35

*MMG Fin. Corp. v. Midwest Amusements Park, LLC*,
    630 F.3d 651 (7th Cir. 2011) ............................................................ 36

*Mmubango v. Leavitt*, 225 F. App'x 393 (7th Cir. 2007) ........................... 27, 28

*Mosley v. Maytag Corp.*, 216 F. App'x 595 (7th Cir. 2007) .............................. 33

*Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966 (7th Cir. 2015).... 25

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ..................... 24

*Ost v. W. Suburban Travelers Limousine, Inc.*,
    88 F.3d 435 (7th Cir. 1996) ............................................................... 33

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ................................................ 36

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012) ........................... 42, 45

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) ................... 29

*Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886 (7th Cir. 2016) ............................. 26

*Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553 (7th Cir. 2001) .................... 46

*Russell v. Acme-Evans Co.*, 51 F.3d 64 (7th Cir. 1995).................................... 27

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir.1998) .................................... 43

*Smith v. Hartogensis*, 541 F. Supp. 3d 1 (D.D.C. 2021)...................................32

**Statutes**

5 U.S.C. § 3311.............................................................................38

**Regulations**

5 C.F.R. § 302.302(d).......................................................................38

## JURISDICTIONAL STATEMENT[1]

The jurisdictional statement of Plaintiff-Appellant Gwendolyn D.

Cunningham is complete and correct.

---

[1] Throughout this brief, the Secretary of Defense will make the following references: (ECF = District Court Docket Number) and (A. Br. = Plaintiff-Appellant's Brief).

## STATEMENT OF THE ISSUES

1.    Ms. Cunningham sued the Secretary of Defense because she was not selected for a promotion.  Did Ms. Cunningham fail to present evidence of pretext where she admitted that the Defense Finance Accounting Service (DFAS) selected another candidate because the selecting official believed the other candidate was more qualified?

2.    Did Ms. Cunningham fail to present evidence of pretext where she relied on her own subjective assessment of the relative qualifications of the other applicants?

## STATEMENT OF THE CASE

### Ms. Cunningham's Employment with the
### Defense Finance Accounting Service

Gwendolyn Cunningham is currently employed at the Defense Finance Accounting Service (DFAS) as a GS-13 Supervisor. [2]  [ECF 44-1, at 18:1-8.] Ms. Cunningham graduated from high school in 1979, after which she did not receive any formal education.  [*Id.* at 11:13-25.]  For three to four years after high school, she worked at a manufacturing plant and then at a Kentucky Fried Chicken.  [*Id.* at 13:1-9.]  She also performed secretarial duties in the Reserves for several years, although she doesn't remember the years.  [*Id.* at 12:1-25.]  After she got married, Ms. Cunningham left the workforce for four or five years.  [*Id.* at 13:10-16.]  In 1986 or 1987, she worked in a federal position as a secretary.  [*Id.* at 13:17-14:1.]

In 1988, she joined DFAS as a part-time secretary at the GS-4 level. [ECF 44-1, at 14:22-17.]  She became a full-time secretary three years later. [*Id.* at 14:21-15:4.]

In 1994, Ms. Cunningham was promoted to retirement counselor at the GS-5 or 6 level.  [ECF 44-1, at 15:5-15.]  Retirement counselors provide

---

[2] "GS level" refers to the General Schedule classification and pay system used for most federal civilian jobs.  The General Schedule has fifteen grades going from GS-1 (lowest) to GS-15 (highest).  *See* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/.

estimates for employees of their anticipated monthly annuity payments. [*Id.* at 15:10-15.] As a retirement counselor, she moved up through the ranks to the GS-7, GS-9, and GS-11 levels. [*Id.* at 15:16-16:9.] In 2012, she was promoted to a GS-12 Benefits Supervisor position. [*Id.* at 15:25-16:3.] As Ms. Cunningham explained, "I'm still a retirement counselor except I'm in a supervisory capacity at this point." [*Id.*]

### DFAS's Benefits and Services Division

DFAS is an agency of the Department of Defense that is responsible for all payments to servicemembers, employees, retirees, annuitants, and major Department of Defense contractors and vendors. [ECF 44-10, at ¶ 1.] DFAS employs over 10,900 people and is headquartered in Indianapolis. [*Id.*] The Benefits and Services Division is part of the Human Resources Department at DFAS. [*Id.* at ¶ 5.] The Benefits and Services Division's responsibilities include handling retirement calculations and worker's compensation claims and operating a Customer Care Center. [*Id.*]

In 2017, the Benefits and Services Division was led by a GS-14 Benefits and Services Division Chief (the "GS-14 Division Chief"), who oversaw three teams: (1) the Benefits team, (2) the Customer Care Center, and (3) the Worker's Compensation team. [ECF 44-10, at ¶ 6.] A GS-12 employee led each of these teams: Ms. Cunningham led the Benefits team, Emanuel Griffin led the Customer Care Center, and Anita Fisher led the Worker's

4

Compensation team.  [*Id.*; ECF 44-11; ECF 44-1, at 32:7-12; 33:4-9.]  Ms. Cunningham had the title of supervisor, while Mr. Griffin and Ms. Fisher had the title of team lead.  [*Id.*]

In Spring 2017, Howard Locke, who at that time was dual hatted as both the GS-14 Division Chief and the GS-15 Director of the Human Resources Shared Services Center, wanted to explore ways to reorganize the Benefits and Services Division to provide a career path for the GS-12 employees to potentially advance to the GS-14 Division Chief position.  [ECF 44-8, at 14:18-15:6; 42:17-43:9; 100:8-16.]  Accordingly, Mr. Locke asked the Classification team to evaluate the organizational structure of the Benefits and Services Division.  [*Id.*]  As a result of the review, Mr. Locke determined that the Benefits and Services Department could convert a vacant GS-12 position to a GS-13 Supervisor position responsible for overseeing the Benefits and Worker's Compensation teams.  [ECF 44-8, at 44:16-45:7; ECF 44-11; 44-12.]

The Classification team also reviewed the classification of existing positions in the Benefits and Services Division, called a "desk audit."  [ECF 44-22.]  In relevant part, they concluded that Ms. Cunningham's role as GS-12 supervisor of the Benefits team was accurately classified at the GS-12 level.  [*Id.* at 1.]

## The GS-13 Supervisor Position

In October 2017, DFAS posted a vacancy announcement for a GS-13 Supervisory Human Resources Specialist (Employee Benefits) ("the GS-13 Supervisor position"). [ECF 44-13.] The position was open to current and former federal employees and preference-eligible candidates such as certain military veterans. [*Id.* at 2.]

The responsibilities of the position were as follows:

- Serves as the first line supervisor responsible for supervising and managing the day-to-day operations of the Employee Benefits Division.

- Provides advisory and consultative services to employees and managers regarding the regulations, policy and program delivery of employee retirement, health and life insurance programs, Thrift Savings Program ("TSP"), and worker's compensation program.

- Represents the Agency to serviced customers in providing high level policy advisory services regarding current or proposed program regulations or service delivery.

- Evaluates program delivery to assess efficiency and effectiveness, and implements policy and procedural changes to improve overall operations.

6

- Provides programmatic analysis of the impact of various benefits programs such as retirements or worker's compensation to assist leadership in short-term and long term workforce planning.

- Supervises a team of specialists and support staff to include planning, assigning and overseeing work, training and developing staff, and resolving grievances and complaints.

[ECF 44-13, at 2.]  Although the Vacancy Announcement closed on November 6, 2017, Mr. Locke decided to wait to make a selection until DFAS had selected a new GS-14 Division Chief.  [ECF 44-8, at 100:25-101:11.]  Mr. Locke had been promoted to the GS-15 Director of HR Shared Services and was only continuing to serve as the GS-14 Division Chief temporarily.  [*Id.* at 100:8-16.]  Because the GS-13 Supervisor would report to the new GS-14 Division Chief, Mr. Locke wanted the new Chief to make the GS-13 Supervisor selection.  [*Id.* at 100:25-101:11.]  Ms. Cunningham agreed at her deposition that she thought the "interviews were delayed because we had a new person coming in as chief, and I guess management wanted him to be able to review the resumes."  [ECF 44-1, at 62:12-16.]

## The Applicants

Andrew Hartz became the GS-14 Division Chief on April 1, 2018.  [ECF 44-10, at ¶ 3.]  Shortly before he assumed the role, human resources personnel created two Certificates of Eligibles (a list of applicants who met

7

the qualifications for the position) for the GS-13 Supervisor position. [ECF 44-14.] The candidates who could be hired through Competitive Merit Promotion were Ms. Cunningham, Anita Fisher, Emanuel Griffin, Anthony Opat, and Tracy Zimmerman. [*Id.* at 1.] The only candidate who could be hired through the Merit Referral List was Emanuel Griffin, who was eligible for non-competitive selection due to his status as a 30% or more service-connected disabled veteran. [*Id.* at 2.]

Three of the applicants, Ms. Cunningham, Emanuel Griffin, and Anita Fisher, were the GS-12 employees who led the three teams that comprised the Benefits and Services Division. [ECF 44-1, at 42:7-15.] Anthony Opat was another GS-12 member of the Benefits and Services Division, although he did not lead a team. [*Id.* at 42:17-19.] Tracy Zimmerman withdrew her application for the position. [ECF 44-14, at 1.]

Of the four applicants, both Ms. Cunningham and Mr. Griffin were African-American. [ECF 44-1, at 32:23-24; 94:5-6.] Ms. Cunningham acknowledged that two of the four candidates were African-American and two of the four candidates were female. [*Id.* at 43:23-44:5.]

## Ms. Cunningham's Application

Ms. Cunningham's resume consisted of two pages and only listed her current position, which commenced in 2012. [ECF 44-15.] She did not list any education, training, professional licenses, or certificates. [*Id.*; ECF 44-1,

8

at 46:14-20.]  When asked why she only listed approximately six years of experience on her resume, Ms. Cunningham said she had a vague memory that the vacancy announcement only asked for five or six years of experience. [ECF 44-1, at 45:24-46:24.]  But when she reviewed the vacancy announcement during her deposition, she could not point to the instruction to list only five or six years of experience.  [*Id.* at 46:25-47:4.]  The resume also listed Howard Locke as her supervisor and provided the first part of his phone number but omitted the last four digits.  [ECF 44-15, at 1.]  Ms. Cunningham does not know why she did not include the complete phone number.  [ECF 44-1, at 45:1-5.]

When the interviews took place, Ms. Cunningham had only worked with the new GS-14 Division Chief Andrew Hartz for a matter of weeks. [ECF 44-1, at 62:24-5.]  She acknowledged that given how little she had worked with Mr. Hartz, her resume was an important part of the application process.  [*Id.* at 63:13-16.]

### Emanuel Griffin's Application

By contrast, Mr. Griffin's resume was nine pages long and listed approximately 32 years of education and experience.  [ECF 44-16.]  Mr. Griffin served in the United States Air Force for approximately 23 years from 1985 to 2008, both full time and then in the United States Air Force Reserves, as an Engineer, Contract Specialist, and Project Manager.  [*Id.* at

8.]  He earned many awards during his time in the Air Force, including the

Air Force Achievement Medal, National Defense Medal, and Iraq Campaign

Medal.  [*Id.* at 11-12.]

Mr. Griffin earned a BS in Construction Engineering Technology from

Grambling State University.  [ECF 44-16, at 8.]  He went on to earn an MBA

from Indiana Wesleyan University.  [*Id.*]  Mr. Griffin also holds many process

improvement certifications, including being a Certified Six Sigma Green Belt

and a Certified QS9000 Quality Auditor.  [*Id.*]

After earning his undergraduate degree, Mr. Griffin worked for

International Truck & Engine Corporation (the successor to International

Harvester) in a variety of roles from 1993 to 2005.  [ECF 44-16, at 5-7.]  At

International Truck & Engine, he managed plant industrial relations for

1,023 employees, was responsible for training for over 1,400 employees, and

handled worker's compensation matters.  [*Id.*]  Mr. Griffin then worked for

Owens Corning from 2005 to 2007, where he managed all corporate

industrial relations, including legal compliance, recruitment and retention,

collective bargaining, and diversity initiatives.  [*Id.* at 4-5.]  From 2008 to

2009, Mr. Griffin worked as an Industrial Relations Manager for the City of

Indianapolis, where he handled civil rights complaints, administered the

performance appraisal system, and participated in human resources program

design.  [*Id.* at 4-5.]

10

In 2009, Mr. Griffin joined DFAS as a Labor Management and Employee Relations Specialist. [ECF 44-16, at 2-3.] In that role, he gained experience training employees and advising upper management on human resources issues. [*Id.*] Then, in 2016, Mr. Griffin joined the Benefits and Services Division as the GS-12 team lead for the Customer Care Center. [*Id.* at 1-2.] In that role, he led a team to operate a call center that handled customer calls related to staffing, benefits, and entitlements. [*Id.*] Through overseeing DFAS's response to customer calls, he was "[f]amiliar with a wide variety of benefits and entitlements programs and services to include Thrift Savings Plan (TSP), health benefits, Federal Employees Group Life Insurance (FEGLI), retirement programs/options." [*Id.* at 2.]

Ms. Cunningham admits that as team lead of the Customer Care Center, Mr. Griffin "had a team of employees or – up under him that answered the phones to provide information regarding vacancy announcements, benefits-related issues, a series of very different questions that the call center was responsible for." [ECF 44-1, at 32:13-19; *see also* 56:1-3 ("Q: What does the care center do? A: They answer the phones regarding benefits-related questions, vacancy announcements, job performances.").] Ms. Cunningham specifically admitted that as team lead of the Customer Care Center, Mr. Griffin would have had some experience with federal benefits. [*Id.* at 99:12-20; 101:7-14.]

11

Despite filing a lawsuit alleging that Mr. Griffin was a "less qualified African American male" and describing him as "far less-qualified for the position" [ECF 1, at 7-8], Ms. Cunningham admitted she had never seen Mr. Griffin's resume until it was shown to her during her deposition.  [ECF 44-1, at 48:10-49:17.]  Ms. Cunningham did not know that Mr. Griffin had a bachelor's degree or MBA.  [*Id.* at 51:2-8.]  She admitted that it would be appropriate for DFAS to consider the fact that Mr. Griffin had an MBA when hiring for a management level position.  [*Id.* at 51:9-12.]  Ms. Cunningham was not aware Mr. Griffin had served 23 years in the United States Air Force.  [*Id.* at 51:13-20.]  Ms. Cunningham was also not aware of Mr. Griffin's certifications, including the fact that he was a certified Six Sigma Green Belt.  [*Id.* at 50:8-23.]  When asked about Mr. Griffin's extensive private sector experience at International Truck & Engine Corporation, Ms. Cunningham said, "I knew that he had some nonfederal Worker's Comp experience," but noted, "I am unaware of what a nonfederal position does."  [*Id.* at 51:21-54:7.]  Ms. Cunningham was unaware of Mr. Griffin's work for Owens Corning or the City of Indianapolis.  [*Id.* at 54:2-19.]  Ms. Cunningham admitted that Mr. Griffin had a higher education level, more private sector work experience, and listed more certifications than she did.  [*Id.* at 59:10-17; 60:25-61:18.]

## The Interviews

After Andrew Hartz became the GS-14 Division Chief, he asked Shante Jones, who was then the GS-14 supervisor of Talent Management and Integration, to serve on the interview panel to hire the GS-13 Supervisor. [ECF 44-10, at ¶ 8.]  Mr. Hartz asked Ms. Jones to be on the interview panel because they had worked together before and he knew she had experience with DFAS HR work processes.  [*Id.*]  Shante Jones is an African-American female.  [ECF 44-1, at 62:22-23.]

Mr. Hartz evaluated the candidates based on four categories: (1) HR & Benefits SME (subject matter expert); (2) Supervisory/Leadership skills; (3) Teamwork & Process Innovation; and (4) Customer Service.  [ECF 44-17, at 1-2.]  In developing the categories, he listed the traits an ideal candidate would demonstrate in each category.  [*Id.*]  Mr. Hartz referred to the six responsibilities listed in the Vacancy Announcement to develop six interview questions to ask each of the candidates:

1. Describe your background and experience with HR and Benefits. What area of HR/Benefits is your most in-depth experience?

2. Why do you want to be the Employee Benefits Supervisor?

3. If selected, this job will require you to manage the workload of a large team.  How do you juggle conflicting priorities?

4. Since 2016, HR has had a rapid increase in size (headcount), which

presents both opportunities and challenges for our organization. Can you give some examples of how you've developed the technical skills of team members assigned to you?

5. As we mentioned at the beginning, this is a new position that will change the structure of the Benefits Division by combining the WC Team and Employee Benefits. If you were selected, what do you think would be your largest challenge or highest priority in the first 30-90 days?

6. What is your style for handling a difficult conversation?

[*Id.*] Each question was tied to one of the four selection categories. [*Id.*]

In formulating the questions, Mr. Hartz actively consulted Ms. Jones and sent her drafts to get her input. [ECF 44-18.] In discussing the interview, they decided to send questions 3 and 4 to the candidates in advance to allow them to prepare a response. [*Id.* at 1.] Accordingly, shortly before each interview, Mr. Hartz e-mailed each candidate those questions. [ECF 44-19.] Mr. Hartz and Ms. Jones interviewed the candidates on May 31, 2018, and June 1, 2018, and took notes of each of the interviews. [ECF No. 44-17, at 3-15 (Hartz) and 16-27 (Jones).]

In his notes, under question 1, Mr. Hartz noted that Ms. Cunningham was the "Best SME [subject matter expert]." [ECF 44-17, at 4.] Under question 2, he noted that it seemed like Ms. Cunningham was applying for

14

the position to maintain the status quo.  [*Id.*]  Under question 3, Mr. Hartz noted that Ms. Cunningham took a "practical" approach.  [*Id.* at 5.]  Under question 4, after Ms. Cunningham stated that her training plan would be to personally train each employee, Mr. Hartz noted, "In the current env[ironment] this approach doesn't scale well."  [*Id.*]  Under questions 5 and 6, Mr. Hartz wrote "good response but tactical."[3]  [*Id.* at 6.]

In describing Ms. Cunningham's interview, Mr. Hartz wrote, "Fundamentally, she was lacking the strategic component.  Her interview responses were good but tactical.  We provided the interviewees two questions in advance, which was designed as a test to see how the candidates would approach a formal situation with advanced warning.  I remember being disappointed that she didn't arrive fully prepared and didn't capitalize on this opportunity.  Her responses to these questions were the least thorough of any of the interviewees.  Her resume appeared incomplete." [ECF 44-21, at 8.]

While Ms. Cunningham disagreed that she wasn't prepared, she admitted, "While I waited to be questioned as to my duties, I may not have offered as much information as they were looking for.  I simply tried to

---

[3] As Mr. Hartz explained at his deposition, "tactical" approaches reflect short-term thinking, whereas "strategic" approaches take into account HR as a whole and the broader customer base.  [ECF 44-9, at 25:21-27:25.]

answer the questions as asked instead of elaborating on things that were not asked." [ECF 44-3, at 3.]  She also felt that if she submitted an incomplete resume, the hiring panel should have "ask[ed] the questions during the interview that would assist the candidate in providing the responses that they did not see within the resume." [*Id.* at 2.]  Nevertheless, Ms. Cunningham admits that if she could do the interview over again, she would have provided more information.  [ECF 44-1, at 121:21-122:24 ("Q: Going back, hindsight being 20/20, would you have proactively offered more information about your background if you had to do the interview again?  A: I would have written a book.  Yes.").]

Regarding Mr. Griffin's interview, Mr. Hartz noted under question 1 that he was a "wide SME [subject matter expert] not deep in fed[eral] bene[fits]." [ECF 44-17, at 10.]  Under question 2, when Mr. Griffin stated that he was applying to the position to change the atmosphere of the Benefits and Services Division, Mr. Hartz noted it was a strategic response.  [*Id.*]  Mr. Hartz noted that Mr. Griffin split question 3 to address it from multiple angles.  [*Id.* at 11.]  Mr. Hartz noted that Mr. Griffin had the best responses to questions 4, 5, and 6.  [*Id.* at 11-12.]  Similarly, Ms. Jones noted that Mr. Griffin "really paid attention to the introduction" and "gave real life situation example." [*Id.* at 24.]  In describing Mr. Griffin's interview, Mr. Hartz wrote that Mr. Griffin, "brought more of a strategic view.  He had private industry

16

experience and he had the best responses to several of the questions.  During the interview, [Mr. Griffin] touched on several facets of the question, and approached both tactics and strategy in his responses."  [ECF 44-21, at 3.]

Following the interviews, Mr. Hartz selected Mr. Griffin for the GS-13 Benefits Supervisor position.  [ECF 44-1, at 81:11-12.]  After Mr. Hartz and Ms. Jones narrowed the selection down to Ms. Cunningham and Mr. Griffin, Mr. Hartz chose Mr. Griffin because he "brought a broader skills mix to the table.  His approach had a strategic perspective in addition to solid tactical approaches."  [ECF 44-21, at 3, 8.]  As Mr. Hartz explained at his deposition, it came down to a question of technical expertise versus the other three factors of leadership, process and innovation, and customer service.  [ECF 44-9, at 95:20-96:19.]  Ultimately, the GS-13 Supervisor position had "greater expectations of complexity and leadership" and he was looking for "more of a strategic person to fill the position."  [ECF 44-21, at 7.]  When Mr. Hartz told Ms. Cunningham she was not selected, he explained to her that he was looking for a more rounded person.  [ECF 44-1, at 81:21-82:1.]

### Ms. Cunningham's EEO Complaints

Ms. Cunningham filed a formal complaint of discrimination, alleging that she was discriminated based on race, color, gender, and age when she did not get the GS-13 Supervisor position.  [ECF 44-5.]  She also alleged, "I feel that I have been constantly looked over for promotion, though others

17

younger, and not as experienced have been promoted." [ECF 44-5.] But despite making this allegation both in her EEO complaint and in the district court [*see* ECF 1, at ¶¶ 50-51], Ms. Cunningham admitted at her deposition that she had never applied for any other promotions that she did not get. [ECF 44-1, at 92:20-93:3 ("Q:…What other promotions had you applied for and not gotten?  A: I had not applied.  Mr. Sture: For?  You had not applied for? A: Any promotions.").]

When Ms. Cunningham was asked during the EEO process why she believed DFAS discriminated against her, she responded, "I feel like I was the best qualified for the position.  Mr. Hartz wanted a more well-rounded person for the position.  The others supported him and his selection." [ECF 44-2, at 3; *see also* ECF 44-1, at 103:6-16.]  When asked if she had any evidence to support her allegation, she responded, "No physical evidence, just his verbal conversation with me, where he stated that he wanted a more well-rounded person for the position." [ECF 44-2, at 3; ECF 44-1, at 103:21-104:2.]  When asked why she believed DFAS discriminated against her based on race/color, Ms. Cunningham responded "I believe they wanted someone else to work with." [ECF 44-2, at 7.]  As Ms. Cunningham explained at her deposition, "I think that they – he more likely preferred someone else, not me." [ECF 44-1, at 106:17-107:3.]  Ms. Cunningham does not know why Mr. Hartz would prefer someone else.  [*Id.* at 107:4-5.]

18

When Ms. Cunningham was asked during the EEO process why she believed DFAS discriminated against her based on gender, she responded, "the selecting official preferred a male." [ECF 44-2, at 7.] When asked at her deposition for the basis for her belief, she responded "[h]eartfelt." [ECF 44-1, at 108:24-109:8 "(Q: So let's move on to the next question. Why do you believe you were not selected because of your sex? And your response was, the selecting official preferred a male. What did you mean by that? A: I just believed that he was not looking forward to working with a female. Q: What's the basis for that belief? A: Heartfelt.").] Nevertheless, Ms. Cunningham acknowledged, "maybe [Mr. Hartz] wanted something different organization-wise or structure – or for the benefits division, and, you know, maybe he felt like he could take that or do that with someone other than myself." [*Id.* at 109:9-22.]

Ms. Cunningham explained, "Emanuel is a friendly guy. He can talk the talk and comes off likeable. [Mr. Hartz] probably thought Mr. Griffin was more suitable for the job. I am direct in my communication. I love my job but I am not a 'yes' person, meaning I want to understand, offer and express an opinion." [ECF 44-2, at 8.] Ms. Cunningham acknowledged that she wasn't the type of person to "have daily chitchat" and that Mr. Griffin might have been selected because he was that type of person. [ECF 44-1, at 109:23-110:16.]

19

Ms. Cunningham admits that she does not know why Mr. Griffin was selected for the GS-13 Supervisor position. [ECF 44-1, at 81:13-15.] When asked at her deposition why she believed she was more qualified than Mr. Griffin, she responded that she had more experience with federal benefits. [ECF 44-1, at 104:17-106:16.] Similarly, when asked in an interrogatory to "[s]tate all facts on which you base your contention that Emanuel Griffin was 'far less-qualified' than you," Ms. Cunningham directed the Secretary of Defense to an allegation in her Complaint that "Griffin had no prior substantive experience in the area of federal employee benefits, nor did he have any prior experience in the area of federal workers compensation programs." [ECF 44-4, at 10 (referring to ECF 1, at ¶ 44).] She did not address the other three hiring categories: (1) Supervisory/Leadership skills; (2) Teamwork & Process Innovation; and (3) Customer Service. [*Id.*] On November 3, 2021, DFAS issued a Final Agency Decision finding that Ms. Cunningham had not established discrimination in the GS-13 Supervisor selection process. [ECF 44-20, at 7.]

In 2020, Ms. Cunningham filed a second EEO Complaint claiming that her GS-12 position underwent a desk audit that "showed that my position should be a GS-14." [ECF 44-7.] She claimed that she "should have been non-competitively promoted to GS-13/14." [*Id.* at 1.] When Ms. Cunningham reviewed the desk audit at her deposition, however, she admitted that it

showed that her position was accurately classified as a GS-12 and that

nothing in the document suggested that her position should have been

reclassified as a GS-14 position.  [*Id.* at 132:20-133:16.]  Ultimately, Ms.

Cunningham's second EEO Complaint was dismissed as untimely.  [*Id.* at

125:8-126:9.]

## Ms. Cunningham's Subsequent Promotion to the GS-13 Supervisor Position

In August 2022, after Mr. Griffin left DFAS to work for a different

federal agency, Ms. Cunningham applied and was selected for the GS-13

Supervisor position.  [ECF 44-1, at 18:1-8.]  Ms. Cunningham admits that she

now has the position that is the subject of the instant litigation.  [*Id.* at 23:21-

24:7.]  Accordingly, this case stems from the approximate four-year time-

period that Ms. Cunningham was a GS-12 rather than a GS-13.  Ms.

Cunningham earns approximately $107,000 as the GS-13 Supervisor.  [*Id.* at

18:9-10.]  She earned approximately $99,000 to $101,000 in her GS-12

position.  [*Id.* at 18:11-13.]

## Procedural History

Ms. Cunningham filed this action alleging sex and race discrimination

based on her non-selection for the GS-13 Supervisor position and because

DFAS never non-competitively promoted her to a GS-14 position.  [ECF 1.]

Following discovery, the district court granted summary judgment in favor of

the Secretary of Defense and against Ms. Cunningham on all of her claims and entered final judgment. [ECF 63, 64.]

Regarding Ms. Cunningham's non-selection claim, the district court held that "[a] holistic view of the evidentiary record does not suggest that Mr. Hartz's GS-13 selection was the product of sex (or sex plus race) discrimination" and that "Ms. Cunningham cannot defeat summary judgment by relying on her suppositions that are ultimately not borne out by the facts." [ECF 63, at 26.]

Regarding Ms. Cunningham's non-competitive promotion claim, the district court held that Ms. Cunningham had abandoned the claim by not including it in her Statement of Claims. [ECF 63, at 26-27.] The district noted that even if it were to consider Ms. Cunningham's non-competitive promotion claim, it would fail both because Ms. Cunningham did not exhaust administrative remedies and because her claim lacked merit.[4] [ECF 63, at 28.]

This appeal timely followed.

---

[4] On appeal, Ms. Cunningham concedes that she abandoned her non-competitive promotion claim. [A. Br. 51.]

22

## SUMMARY OF THE ARGUMENT

Summary judgment in favor of the Secretary of Defense is the correct result in this case.  Ms. Cunningham's claim cannot succeed.

The central question here is whether Mr. Hartz's stated reliance on qualifications to promote someone other than Ms. Cunningham was pretextual.  But Ms. Cunningham's own admissions directly undermine any pretext claim.  As she acknowledged, Mr. Hartz selected Mr. Griffin because he believed Mr. Griffin was more qualified than her for the GS-13 Supervisor position.

Considerable undisputed evidence corroborates Mr. Hartz's reliance on qualifications in making the selection.  Even if the Court scrutinizes Ms. Cunningham's and Mr. Griffin's respective qualifications, Ms. Cunningham cannot show that her qualifications were so superior to Mr. Griffin's that an employer could not have reasonably selected him for the position.  Ms. Cunningham's subjective beliefs about her own qualifications are not sufficient to overcome summary judgment.

This Court should affirm.

## ARGUMENT

### I.     Legal Standard

#### A.     Standard of Review

This Court reviews the district court's grant of summary judgment *de novo*, viewing the record and all reasonable inferences drawn from the record in the light most favorable to the nonmoving party.  *Hottenroth v. Vill. of Slinger,* 388 F.3d 1015, 1027 (7th Cir. 2004).

### II.    Ms. Cunningham Cannot Meet Her Burden of Establishing Pretext

At the summary judgment stage, the proper question to ask in employment discrimination cases is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action."  *Ortiz v. Werner Enterprises, Inc*., 834 F.3d 760, 765 (7th Cir. 2016).  Although *Ortiz* overruled a line of cases separating discrimination claims into "direct" and "indirect" categories and assigning different legal standards to each, nothing in *Ortiz* displaced the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017).  The *McDonnell Douglas* framework remains a common, but not exclusive, means of organizing, presenting, and assessing circumstantial

24

evidence in discrimination cases. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under the *McDonnell Douglas* framework, Ms. Cunningham must first produce evidence that she: (1) belongs to a protected class, (2) met her employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class. *David*, 846 F.3d at 225. If a plaintiff can establish a prima facie case, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employer's rejection." *McDonnell Douglas*, 411 U.S. at 802; *see also Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966, 974 (7th Cir. 2015). Unless a plaintiff can present sufficient evidence that the defendant's proffered reason is a pretext for discrimination, the defendant is entitled to summary judgment. *McDonnell Douglas*, 411 U.S. at 802.

Here, it is undisputed that Ms. Cunningham established a prima facie

gender claim[5] and that DFAS met its burden of articulating a legitimate,

non-discriminatory reason for its decision to promote Mr. Griffin.

Accordingly, the only remaining question before the Court is whether Ms.

Cunningham put forward evidence that DFAS's reasons for its decision were

pretextual.  Ms. Cunningham did not meet her burden of proving pretext.

### A.    Ms. Cunningham Admitted that Mr. Hartz Promoted Mr. Griffin Because He Believed Mr. Griffin Was the Better Candidate

Because the Secretary of Defense has articulated legitimate, non-

discriminatory reasons for promoting Mr. Griffin, the burden shifts to Ms.

---

[5] Ms. Cunningham brought discrimination claims based on both gender and race.  Applying *McDonnell Douglas*, she cannot make out a prima facie case for race discrimination because she and Mr. Griffin are both African-American.  *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (affirming grant of summary judgment in non-promotion case because person promoted was also African-American); *see also Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005) (same).  On appeal, Ms. Cunningham claims that she is bringing a claim for "sex-plus" discrimination and not a standalone race discrimination claim.  [A. Br. 20.]  The Court has not recognized a claim for a "sex-plus" or intersectional discrimination claim.  *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009) ("We have not yet decided in this circuit whether we recognize a 'sex-plus' theory of discrimination, *see Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638 n. 2 (7th Cir. 2001), which hinges on disparate treatment based on sex in conjunction with another characteristic.").  Without deciding the viability of a sex-plus claim, the district court noted that like a gender discrimination claim, a sex-plus claim required Ms. Cunningham to put forward evidence that she was discriminated against because she was female, which she failed to do.  [ECF 63, at 17-19, 26.]  Because the district court held that Ms. Cunningham failed to put forward evidence of gender discrimination to support either a sex or sex-plus claim, the existence of a sex-plus claim is not at issue on appeal.

26

Cunningham to "establish that there is an issue of material fact as to whether the . . . proffered reasons are merely a pretext for unlawful discrimination or retaliation." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). Pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) ("A pretext, to repeat, is a deliberate falsehood. An honest mistake, however dumb, is not, and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage."). "The analysis of pretext focuses only on what the decisionmaker, and not anyone else, sincerely believed." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004).

In the context of hiring, the Court has noted that it is not the "court's role to second-guess an employer's business judgment about an applicant's qualifications." *Mmubango v. Leavitt*, 225 F. App'x 393, 396 (7th Cir. 2007). "An employer's decision to favor one candidate over another can be mistaken, ill-considered or foolish, but so long as the employer honestly believed those reasons, pretext has not been shown." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (internal quotations and citations omitted). Indeed, the Court has "repeatedly stressed that we do not sit as a superpersonnel department where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Id.*

27

(internal quotations and citations omitted).

Here, Ms. Cunningham has no evidence that Mr. Hartz's reasons for selecting Mr. Griffin were pretextual. Ms. Cunningham repeatedly admitted that Mr. Hartz legitimately believed that Mr. Griffin was the best candidate for the job. [ECF 44-1, at 109:23-110:24 ("[Mr. Hartz] probably thought Mr. Griffin was more suitable for the job."); 109:9-22 ("I felt like maybe he wanted something different organization-wise or structure – or for the benefits division, and, you know, maybe he felt like he could take that or do that with someone other than myself."). [6]]

While Ms. Cunningham might have felt that she was the best candidate, she has put forward no evidence to suggest that Mr. Hartz thought she was the best candidate. *See Mmubango*, 225 F. App'x at 396 ("the mere fact that Mmubango disagrees with EPA's assessment of his skills is insufficient to establish that EPA did not honestly believe its assessment to be correct."); *Blise*, 409 F.3d at 867-68 ("Blise may be right—she may be more

---

[6] Ms. Cunningham now claims that she did not concede that Mr. Hartz had legitimate reasons for selecting Mr. Griffin, but rather was "parroting" reasons Mr. Hartz gave to her. [A. Br. 42.] But this new claim is belied by the language she used (i.e. "probably thought," "I felt like maybe he wanted") and the detail she provided, which indicates that she was stating her own opinion. [ECF 44-1, at 109:9-111:3.] Furthermore, she testified that the only thing she remembers Mr. Hartz telling her about the selection was that he was looking for a more rounded person. [ECF 44-1, at 81:21-82:7.] Accordingly, based on her own testimony, there was nothing beside that statement to "parrot" back.

qualified than Davis, and Davis may not be qualified at all—but so long as Kenosha genuinely believed differently (and Blise offers us no evidence that its agents did not), it is entitled to act on that belief.").  Because Ms. Cunningham admitted that Mr. Hartz believed Mr. Griffin was the best candidate, she cannot meet her burden of proving pretext.[7]

Similarly, Ms. Cunningham's argument that Mr. Hartz's assessment was "subjective" does not establish pretext.  The Court has held "subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy."  *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir.

---

[7] Ms. Cunningham argues that the Court should disregard Mr. Hartz's statement that he selected Mr. Griffin because he was the best qualified candidate because he is an "interested witness."  [A. Br. 43-44.]  But the case Ms. Cunningham cites addresses the standard for granting judgment as a matter of law following a jury verdict pursuant to Rule 50.  *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (noting that a court must disregard "all evidence favorable to the moving party that the jury is not required to believe" but should credit uncontroverted testimony from disinterested witnesses).  By contrast, the Court has repeatedly emphasized that so-called "self-serving" affidavits are admissible evidence at the summary judgment stage.  *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.").  As the Court explained, "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving."  *Id.*  Ms. Cunningham cannot ask the Court to refuse to consider Mr. Hartz's explanations for his decision to promote Mr. Griffin by branding them "self-serving."

2002) (internal quotation and citation omitted).  "[A]bsent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII." *Id.* (internal quotation and citation omitted).  Ms. Cunningham's argument that Mr. Hartz was not allowed to consider the candidates' respective interview performances is meritless.

## B.    The Applicants' Respective Qualifications Do Not Support a Finding of Pretext

Even if Ms. Cunningham had not affirmatively admitted that Mr. Hartz believed Mr. Griffin was better qualified, she could still not meet her burden of establishing pretext.  "[W]here an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook*, 280 F.3d at 1180  (internal quotations and citations omitted).  Put another way, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen

the candidate selected over the plaintiff for the job in question." *Id.* (internal quotations and citations omitted).

Ms. Cunningham cannot prove that she was indisputably better qualified for the GS-13 Supervisor position. Ms. Cunningham's resume listed only six years of experience and no education, certifications, or anything else to recommend her for the position. [ECF 44-15.] Mr. Griffin's resume reflected over 32 years of experience, including a 23-year military career, a college degree and an MBA, numerous relevant certifications, extensive private sector experience, and familiarity with federal benefits through his leadership of the Customer Care Center. [ECF 44-16.]

When asked in discovery for the basis for her belief that she was far more qualified than Mr. Griffin, she said, "Griffin had no prior substantive experience in the area of federal employee benefits, nor did he have any prior experience in the area of federal workers compensation programs." [ECF 44-4, at 10 (referring to ECF 1, at ¶ 44).] But Ms. Cunningham admitted at her deposition that in leading the Customer Care Center, Mr. Griffin had at least some experience with federal benefits. [ECF 44-1, at 99:12-20; 101:7-14.] And given that the GS-13 Supervisor's role was to lead the team and not to personally process retirement benefits, subject matter expertise was only one of four of the selection categories for the position. [ECF 44-17, at 1-2.] In her interrogatory responses, Ms. Cunningham did not contend that she was more

31

qualified than Mr. Griffin on the other three factors.  [ECF 44-4, at 10.]

Furthermore, Ms. Cunningham's argument that Mr. Hartz should have focused only on federal experience and ignored Mr. Griffin's military and private sector experience in evaluating him as a candidate is baseless.  Ms. Cunningham has not pointed to anything that requires a federal employer to disregard a candidate's decades of relevant military and private sector experience.  Indeed, perhaps more so than any employer in the nation, the Department of Defense recognizes how translatable the leadership and organizational skills gained through military service are to the civilian workforce.  And in fact, courts have forcefully rejected the argument that government employers cannot consider private sector experience in making hiring decisions.  *See, e.g., Smith v. Hartogensis*, 541 F. Supp. 3d 1, 12 (D.D.C. 2021) ("The Court will not second guess the Corporation's decision to consider private sector work equal to government work.  The Corporation is no different from the countless government agencies and private companies that consider both experiences relevant, allowing D.C.'s 'revolving door' to keep turning.") (internal quotation and citation omitted); *Mengistu v. Mississippi Valley State Univ.*, 716 F. App'x 331, 334 (5th Cir. 2018) (rejecting employee's argument that private sector experience was less valuable).  Ms. Cunningham cannot simply dismiss Mr. Griffin's years of military service and private sector work experience as inferior to hers by

calling them "nonfederal."

Ms. Cunningham's argument primarily rests on her subjective opinion that she was more qualified than Mr. Griffin. But as the Court has repeatedly held, "[i]t is well settled, however, that a plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions." *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996); *accord Mosley v. Maytag Corp.*, 216 F. App'x 595, 597 (7th Cir. 2007).

Although the GS-13 Supervisor Position lists six responsibilities, Ms. Cunningham addresses just two in her brief, claiming they were the "main" ones. [*Compare* A. Br. 12 (listing two responsibilities) *with* ECF 44-13, at 2 (listing six responsibilities).] Based on this cherry-picked subset of responsibilities, she created a chart evaluating herself on the criteria, "Federal Benefits Experience," "Subject Matter Expert Federal Benefits (SME)," "Federal Service Supervisory Experience," "Acting Chief of Benefits Experience," "Federal Worker's Comp Experience," and "Private Sector Worker's Comp Experience." [A. Br. 16-18.] Unsurprisingly, Ms. Cunningham ranked herself higher than Mr. Griffin in all but one of her self-selected categories. [*Id.*]

But Ms. Cunningham's categories are largely untethered to the hiring

criteria for the GS-13 Supervisor position, which included skills such as "[r]epresent[ing] the Agency to serviced customers in providing high level policy advisory services regarding current or proposed program regulations or service delivery" and "[e]valuat[ing] program delivery to assess efficiency and effectiveness, and implements policy and procedural changes to improve overall operations." [ECF 44-13, at 2.] Ms. Cunningham cannot simply create her own selection criteria that emphasizes longevity rather than skill and then argue that she is more qualified than Mr. Griffin based on the rubric she created.

Ms. Cunningham's opinions about Mr. Griffin's qualifications are also irrelevant and insufficient to overcome summary judgment. Ms. Cunningham admitted at her deposition that she didn't know that Mr. Griffin had a bachelor's degree or an MBA; that he served 23 years in the United States Air Force; or that he was a certified Six Sigma Green Belt. [ECF 44-1, at 50:8-51:20.] She knew that he had worked in the private sector, but admitted she was "unaware of what a nonfederal position does." [*Id.* at 51:21-54:7.] Because Ms. Cunningham admitted she was unaware of Mr.

Griffin's qualifications, she has no basis to claim that they were inferior to hers.[8]

Ultimately, regardless of what Ms. Cunningham herself believes, she was required to put forward evidence that Mr. Hartz believed that she was more qualified than Mr. Griffin, which she has failed to do. *See Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter."); *Millbrook*, 280 F.3d at 1178 ("this court has held that a jury verdict for the employee cannot stand if the jury is simply disagreeing with the company as to who is best qualified").

In sum, Ms. Cunningham's claim appears to be based on nothing more than speculation. She admitted that she does not know why Mr. Griffin was selected for the GS-13 Supervisor Position and that she did not have any facts to support her discrimination claim beyond the allegations in the

---

[8] Ms. Cunningham also makes much of an e-mail from Anthony Opat sent to Howard Locke in January 2017, months before the GS-13 Supervisor position was even created and a year and a half before the selection was made, suggesting that Ms. Cunningham deserved the chance to compete for a promotion. [A. Br. 28-29.] But by the time the vacancy was announced, Mr. Opat seems to have changed his tune, as he applied for the vacancy himself. [ECF 44-14.] Even if he hadn't, Ms. Cunningham's co-worker's opinion is irrelevant to establish pretext. *See Little*, 369 F.3d at 1015 ("The analysis of pretext focuses only on what the decisionmaker, and not anyone else, sincerely believed.").

Complaint.  [ECF 44-1, 81:13-15; ECF 44-4, at 11.]  When asked for the basis for her belief that she experienced race discrimination, she stated that they wanted to work with someone else for unknown reasons.  [ECF 44-1, at 106:17-107:5.]  When asked for the basis for her belief that she experienced gender discrimination, she responded, "[h]eartfelt."  [ECF 44-1, at 108:24-109:8.]  But as the Court has explained that a plaintiff cannot "thwart summary judgment by speculating as to the defendant/employer's state of mind." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (collecting cases); *accord Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 899 (7th Cir. 2018).  The same is true here; Ms. Cunningham's speculation is not sufficient to overcome summary judgment.

## C.   Mr. Griffin Exceeded the Minimum Qualifications for the Job

Ms. Cunningham also now claims that Mr. Griffin did not meet the minimum qualifications to apply for the GS-13 Supervisor position.  [A. Br. 24.]  But Ms. Cunningham conceded that Mr. Griffin met the minimum qualifications in district court and cannot change her argument on appeal. [ECF 48, at 16 ("Mr. Griffin barely met the minimum qualifications… .")); *see also MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 659 (7th Cir. 2011) (a party "cannot change course on appeal to raise an argument different than the one it presented to the district court").]  Based on Ms.

36

Cunningham's concession, the district court found that "[t]here is no dispute that both remaining candidates satisfied the minimum qualifications for the GS-13 Supervisor position, as they each had at least one year of specialized experience from their respective GS-12 positions." [ECF 63, at 13.] Accordingly, Ms. Cunningham waived a claim that Mr. Griffin did not meet the minimum qualifications for the position.

Even if the Court were to consider the merits of her argument, there is none to be found. The vacancy announcement required one year of specialized experience "advising and guiding senior management and customers regarding employee Health Benefits, Retirement and/or Workers Compensation programs, regulations, policy and standards, training and reviewing the work of team members; and resolving issues involving the administration of benefits, retirement or workers compensation programs." [ECF 44-13, at 3.] At the time he applied, Mr. Griffin had managed the DFAS Customer Care Center that handled a wide variety of benefits related issues for over a year. [ECF 44-16, at 1.] Therefore, even based solely on his federal experience, he was qualified to apply for the job. Additionally, Mr. Griffin had also served as a Benefits, Compensation and Training Manager for International Truck & Engine Corporation, where he handled benefits and worker's compensation issues for a large corporation. [*Id.* at 6-7.] As is clear from his resume, Mr. Griffin easily exceeded the minimum

qualifications for the position.

Ms. Cunningham argues that it was "implicit" that DFAS was only allowed to consider federal experience in evaluating whether candidates met the minimum qualifications.  [A. Br. 24.]  But because the position was open to certain non-federal employees such as disabled veterans, DFAS could not require prior federal experience.  *See* 5 U.S.C. § 3311; 5 C.F.R. § 302.302(d). Indeed, as Susan Davenport, the human resources specialist who drafted the vacancy announcement, explained, both federal and private sector work experience could count toward the specialized experience requirement because "when we're announcing to the outside, we can't say you have to have federal experience."  [ECF 49-22, at 36:16-37:4.]  She explained that if DFAS "specifically require[d] that you have federal health benefits, federal Worker's Comp, you're automatically disadvantaging persons with disabilities."  [*Id.* at 85:9-17.]  Indeed, Ms. Davenport unequivocally testified that the specialized experience was not limited to federal benefits or worker's compensation experience.[9]  [*Id.* at 85:18-86:5 ("Q: And I'm just trying to interpret – A: Okay.  Q: --you know, what this means because you drafted it.  And I'm just trying to – A: Okay.  Q:  So you didn't mean that – exclusively federal

---

[9] Ms. Cunningham cites portions of Ms. Davenport's deposition where she states that the *responsibilities* of the position would be in federal government and then incorrectly claims she was referring to the *requirements* for the position.  [A. Br. 25.]

employee health benefits – A: Correct, I did not.  Q: -- or federal retirement?
A: Correct.  Q:  Okay.  A:  That's correct.").]  In light of this testimony, Ms.
Cunningham's claim that DFAS could only consider prior federal experience
in evaluating specialized experience is simply incorrect. With or without
considering his past private sector employment, Mr. Griffin was qualified to
apply for the position, as Ms. Cunningham admitted in district court.

### D.    The Interview Questions Were Job Related

Ms. Cunningham's argument that the interview questions were not job
related is similarly meritless.  Mr. Hartz referred to the six responsibilities
listed in the Vacancy Announcement to develop six interview questions.
[ECF 44-17, at 1-2.]  Each one was tied to one of the four selection categories:
(1) HR & Benefits SME (subject matter expert); (2) Supervisory/Leadership
skills; (3) Teamwork & Process Innovation; and (4) Customer Service.  [*Id.* at
2.]  A quick review of the questions, such as "Why do you want to be the
Employee Benefits Supervisor?" and "If you were selected, what do you think
would be your largest challenge or highest priority in the first 30-90 days?"
demonstrates that all of the questions related to the GS-13 Supervisor
position.  [*Id.*]

Indeed, Ms. Cunningham's argument appears to be based on a logical
fallacy.  When Shante Jones was asked whether the panel specifically asked
questions about two of the items listed in the vacancy announcement, she

said they didn't.  [A. Br. 32-33.]  But it does not logically follow that because the panel did not ask questions about two specific aspects of the job, that the questions they did ask were not job related.

Finally and fundamentally, even if the panel had asked extraneous questions (they didn't), Ms. Cunningham put forward no evidence that it was done as a pretext to discriminate against women.  *See Jajeh v. Cnty. of Cook*, 678 F.3d 560, 572-73 (7th Cir. 2012) (no evidence of pretext where policy violation affected all employees); *Guinto v. Exelon Generation Co.*, LLC, 341 F. App'x 240, 247 (7th Cir. 2009) ("Thus, to the extent that Exelon misread its own policies, the record suggests that it failed to follow its own internal procedures with *all* employees.") (emphasis in original).  Given that the same questions were asked of all candidates, Ms. Cunningham cannot show that even if DFAS had violated its own policies, it did so to discriminate against women.

### E.     Ms. Cunningham Admitted the Selection Was Delayed So Mr. Hartz Could Make the Selection

Ms. Cunningham next claims that Mr. Locke's decision to delay the selection of the GS-13 Supervisor until there was a new GS-14 Division Chief was pretext for discrimination.  But Ms. Cunningham admitted at her deposition that the selection was delayed so that Mr. Hartz could select the person whom he would be responsible for supervising.  [ECF 44-1, at 62:12-16

("interviews were delayed because we had a new person coming in as chief, and I guess management wanted him to be able to review the resumes.").] Ms. Cunningham cannot now argue that DFAS's decision to delay the selection is evidence of pretext when she admitted at her deposition that it was done for legitimate reasons.

Ms. Cunningham also cites a DFAS policy that provides that DFAS should make a selection within 120 days of the close of the vacancy announcement. [A. Br. 33-35.] But the policy specifically provides that "[e]xceptions to this may be requested by working with the staffing specialist." [ECF 49-19, at 20.] Furthermore, even if DFAS had violated its policy, Ms. Cunningham does not explain how this policy violation prejudiced her or female candidates generally. *See Guinto*, 341 F. App'x at 247 (failure to follow policy not evidence of pretext where it affected all employees equally); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013) ("Of course, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus."). Even if DFAS did delay selection for the GS-13 Supervisor position so that new GS-14 Division Chief could make the selection, Ms. Cunningham put forward no evidence beyond her own speculation that this was done for anything other than valid business reasons.

41

### F.     Ms. Cunningham Has the Burden of Establishing Pretext

Ms. Cunningham next claims that instead of a plaintiff having the burden of establishing pretext, the employer has the burden of establishing "honest belief" as an affirmative defense. *Contra McDonnell Douglas*, 411 U.S. at 802. But Ms. Cunningham never raised this argument in district court, and therefore waived it. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal.").

Even if Ms. Cunningham hadn't waived the argument, the Secretary of Defense did plead an "honest defense." In the operative answer, he pleaded, "All employment decisions regarding Plaintiff were made for legitimate, non-discriminatory, and non-pretextual reasons." [ECF 27, at 12.] Similarly, in his Statement of Defenses, he stated, "Defendant intends to prove that it had legitimate, non-discriminatory, non-pretextual reasons for selecting Mr. Griffin, who had an MBA, was Six Sigma certified, and who had decades of experience obtained through a 23-year career in the Air Force, management level private sector positions, and a leadership role at DFAS." [ECF 35, at 2.] Ms. Cunningham cannot claim that she did not know the Secretary of Defense would argue that Mr. Hartz honestly believed Mr. Griffin was better qualified.

Finally, Ms. Cunningham's argument that "honest belief" is an

affirmative defense is incorrect.  Notably, Ms. Cunningham cites only a Sixth

Circuit and a Southern District of Ohio case for the proposition that an

employer must plead "honest belief" as an affirmative defense.  [A. Br. 40.]

But the Sixth Circuit has specifically rejected this Court's jurisprudence on

establishing pretext:

> Under the "honest belief" rule developed by the Seventh Circuit, "so long
> as the employer honestly believed in the proffered reason," an employee
> cannot prove pretext even if the employer's reason in the end is shown
> to be "mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*,
> 155 F.3d 799, 806 (6th Cir.1998) (citing, inter alia, *Kariotis v. Navistar
> Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir.1997)).  We have rejected
> the Seventh Circuit's bare "honest belief" doctrine and instead have
> adopted a modified honest-belief approach.

*Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007).

Therefore, in the Sixth Circuit, "the burden is on the employer to point to

specific facts that it had at the time the decision was made which would

justify its belief in the proffered reason."  *Id.* at 714.

By contrast, this Court has held that "[t]o avoid summary judgment, a

plaintiff must present evidence showing that the employer did not honestly

believe his proffered reason."  *Hague v. Thompson Distribution Co.*, 436 F.3d

816, 825 (7th Cir. 2006).  Because Ms. Cunningham bears the burden of

establishing pretext, her argument that "honest belief" is an affirmative

defense fails as a legal matter.

43

**G.     Ms. Cunningham's Claim that DFAS Could Have Non-Competitively Promoted Her into Upper Management Is Meritless**

Ms. Cunningham claim that she should have been non-competitively promoted to the GS-13 Supervisor position and then to the GS-14 Division Chief is a dead end, too.  Ms. Cunningham admits that a desk audit of the Benefits and Services Division determined that her position was accurately classified as a GS-12 position and that nothing in the document suggested that her position should have been classified higher.  [ECF 44-1, at 132:20-133:16.]  While Ms. Cunningham believed that she had accreted duties that warranted a higher grade, it is undisputed that DFAS did not agree.  [ECF 44-22, at 1.]

In fact, the record shows that DFAS competitively selected for the GS-13 Supervisor position and the GS-14 Division Chief because, as Howard Locke explained, "It's not typically our practice to recruit higher level positions of 13 slide 14, 12 slide 13.  We don't typically do that."  [ECF 44-8, at 56:8-57:10.]  He emphasized, "I believe it takes more time, experience in the job to be ready for the higher level job.  We also had a number or candidates that qualified for the 14 level position, so there wasn't a need from a recruiting standpoint to expand the talent pool by offering a 13 slide 14 position."  [*Id.*]  Accordingly, Ms. Cunningham provided no basis to claim DFAS's decision to competitively select its management candidates was used

as a pretext to discriminate against her.

## H.    The Statistical Report Does Not Show Pretext

Finally, the statistical report Ms. Cunningham references does not establish pretext.  The district court noted that Ms. Cunningham failed to develop an argument around the report, and therefore did not take it upon itself to craft one for her.  [ECF 63, at 17 n.6.]  Because Ms. Cunningham did not develop an argument around the statistical report in district court, she has waived it on appeal.  *Puffer*, 675 F.3d at 718 ("Moreover, even arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.").

But even if the Court were to consider it, the report is not sufficient to overcome summary judgment.  The Court has "rejected efforts to use statistics as the primary means of establishing discrimination in disparate treatment situations" and has held that statistics can only be used in conjunction with other evidence.  *Bell v. E.P.A.*, 232 F.3d 546, 552 (7th Cir. 2000); *see also Baylie v. Fed. Rsrv. Bank of Chicago*, 476 F.3d 522, 524 (7th Cir. 2007) ("But data showing a small increase in the probability of discrimination cannot by itself get a plaintiff over the more-likely-than-not threshold; it must be coupled with other evidence, which does most of the work.").   Here, given the lack of other evidence of pretext, the statistical report standing alone is not sufficient to overcome summary judgment.

45

Furthermore, Ms. Cunningham failed to establish that the report contains a statistically significant data set.  For example, according to the report, although African-American males were hired at a higher rate than African-American females for 201-series positions, they were also hired at more than double the rate of White males and White females.  [ECF 49-23, at 28.]  Hispanic females also significantly outperformed White males and White females.  [*Id.*]  Given the small sample size (4 African-American males, 1 African-American female, 2 White males, 2 White females, 1 Hispanic female, and 1 Hispanic male), it is unclear whether the data is statistically significant or just a natural variation based on individual selection processes. [*Id.*; *see also Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 559 (7th Cir. 2001) ("Statistical evidence must also take into account nondiscriminatory explanations.") (internal quotation and citation omitted).]

Ms. Cunningham also noted that Black women only represented 5.26% of female GS-13 201-series employees but omitted the fact that they represented 42.86% of the higher-graded GS-14 201-series employees.  [A. Br. 49; ECF 49-23, at 26.]  Ultimately, Ms. Cunningham was required not to simply quote statistics but to demonstrate through expert testimony or otherwise that the data was statistically significant evidence of discrimination.  She failed to do so.

46

## CONCLUSION

For the reasons stated above, the Court should affirm the district court's judgment.

Respectfully submitted,

ZACHARY A. MYERS
United States Attorney

By:     /s/ *Rachana N. Fischer*
        Rachana N. Fischer
        Assistant United States Attorney

47

## CERTIFICATE OF COMPLIANCE
## IN ACCORDANCE WITH CIRCUIT RULE 32

The foregoing BRIEF FOR THE APPELLEE complies with the type

volume limitations required under Circuit Rule 32 of the United States Court

of Appeals for the Seventh Circuit in that there are not more than 14,000

words and that there are 10,090 words typed in Microsoft Word word-

processing this 16th day of August, 2024.


/s/ *Rachana N. Fischer*
Rachana N. Fischer
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on August 16, 2024, I electronically filed the foregoing

BRIEF FOR THE APPELLEE with the Clerk of the Court for the United

States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system to the following:

Tae Sture
STURE LEGAL SERVICES LLC
tae@sturelaw.com
Attorney for Gwendolyn D. Cunningham

/s/ *Rachana N. Fischer*
Rachana N. Fischer
Assistant United States Attorney
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333